MUTUAL UNION TEL. Co. *v.* CITY OF CHICAGO and another.

*(Circuit Court, N. D. Illinois.* March, 1883.)

1. MUNICIPAL CORPORATION—AUTHORITY OF MAYOR OF CITY—REMOVING TELE-
GRAPH WIRES—ORDINANCE LIMITING TIME—INJUNCTION.

  Where a telegraph company erects poles and strings wires within a city under
  authority of an ordinance of the city council which provides that such au-
  thority or privilege shall expire on and after a certain day named therein, the
  mayor of such city has no right of his own motion, and without any express
  direction from the city council, and without notice to the company, to cut and
  remove the wires after the expiration of the time limited in the ordinance, and
  he will be liable as a trespasser for so doing; but notwithstanding that fact, an
  injunction will not be granted to restrain the city authorities from interfering
  with the company in replacing the wires, because this would enable it to do
  what it has no legal right to do under the ordinance.

2. SAME—CITY AUTHORITY TO REGULATE TELEGRAPH PRIVILEGES.

  Notwithstanding telegraph lines are instruments of commerce, a city has the
  right to determine how, in what manner, and upon what condition a telegraph
  company shall enter the city and pass through it for the purpose of communi-
  cation, or allowing the citizens of the country to communicate by telegraph
  one with another.

In Equity.

*Lyman Trumbull,* for plaintiff.

*Julius Grinnell,* for defendant.

DRUMMOND, J.   The plaintiff is a corporation of the state of New
York, and being desirous of establishing a telegraph line in Chicago,
made application to the city council for permission to establish such
line, and on December 29, 1881, an ordinance was passed for that
purpose, giving the company the right to erect poles and to place
wires upon them for telegraph purposes in the manner therein de-
scribed.   But the sixth section of the ordinance declared "that the
line of telegraph poles erected, and the wires strung under the
provisions of this ordinance, shall be of a *temporary character only,*
and for the purpose of enabling the said Mutual Union Telegraph
Company to do business while it is perfecting a system of under-
ground telegraphs; and due diligence shall be used to perfect and put
in operation said system on or before the first day of March, A. D.
1883, *and all the rights and privileges granted under this ordinance shall
terminate on the first day of March, 1883,* and constructions thereun-
der be removed at the expense and costs of said company, its success-
ors or assigns."   The ordinance further provided that before the
company should have the right to "erect the said temporary line of
poles and string wires," it should execute to the city a bond with

proper sureties to be approved by the mayor, in the penal sum of $25,000, the condition of which bond was prescribed by the ordinance; and accordingly a bond with sufficient sureties was in January, 1882, executed to the city with the condition prescribed. The condition required "that the company should pay all the damages caused to the city, or to any person or property by the erection of the line or the removal thereof, and that the company should at all times save and keep the city harmless from all damages, loss, or expense caused by the erection of the poles and the placing of the wires thereon, by the maintenance of the same and the removal thereof, and that the company should take down and remove the poles and wires at the time designated in the ordinance, or sooner if ordered and directed by the mayor, and should pay or cause to be paid all expense, cost, or damage that the city might be put to or sustain in removing or taking down the poles or wires in case the company should fail or neglect to remove them at the time designated, or upon the order and direction of the mayor. A further condition was that the company should at all times comply with the ordinance and with the provisions thereof, and with the direction or orders of the mayor or commissioner of public works in regard to the erection, maintenance, or removal of the same. The defendant Harrison who is the mayor of the city, assuming that he had the right under the ordinance after the first day of March to cut and remove the wires from the telegraph poles used by the plaintiff, directed it to be done, and they were accordingly severed and the company prevented from using them for telegraphic purposes. After this had been done, the company on the fifth of March filed a bill in this court alleging the destruction of the wires by the defendant, and declaring that it had, in good faith, made experiments to perfect a system of underground telegraphing before the first day of March, and expended large sums for that purpose, which had not been successfully accomplished, and that it could not, therefore, transmit telegraphic dispatches otherwise than upon the wires placed upon the poles before that time used by the company. The bill prays that the defendants may be restrained from further cutting, interrupting, or removing any of the wires or poles of the plaintiff, and from interfering with the plaintiff in reconnecting, maintaining, repairing, and operating the same; or that the defendants may be restrained from doing any of the acts complained of until such time as by the exercise of due diligence a practical method of underground telegraphy could be devised and put in operation.

It appears that the defendants have not done anything to the poles or wires of the plaintiff since the bill was filed, of which any complaint is now made. No notice was given to the plaintiff, before the acts done by the defendant, which requested the removal of the poles or wires, nor was any notice given of the intentions of the mayor. He seems to have acted of his own motion, and without any express direction from the city council. It should also be stated that there is an allegation in the bill that in June, 1881, the plaintiff, by an arrangement with the Chicago & Milwaukee Telegraph Company, obtained the right to string and maintain upon the poles of that company telegraphic wires, but there is no statement in the bill of the authority under which that company had erected poles or placed telegraphic wires upon them. There is a statement that the plaintiff has accepted the provisions of the act of congress of July 24, 1866, but the date of the acceptance is not mentioned. When the motion for an injunction was argued, a day or two since, the court intimated that the mayor had not the right to cut and remove the wires in the manner stated, and without notice to the plaintiff, and also expressed a doubt whether the acts complained of being past, it could, under the facts of the case, by way of injunction, enable the plaintiff to replace the wires for the purpose of resuming telegraphic operations in the city. The counsel of the parties, since the argument, have furnished briefs and also cited authorities upon these two points, the principal one being whether the plaintiff can be permitted to put itself in the position it was before the acts complained of were performed by the mayor. What may be said by the court must be understood as limited to the rights of the parties under the ordinance already referred to and their acts connected therewith. If the plaintiff has other rights by contract with other telegraphic companies, they must stand upon the authority of those companies to confer such rights.

On further consideration, I am not disposed to change the opinion heretofore expressed as to the right of the mayor to cut and remove the telegraph wires. The right existed either by virtue of his authority as executive officer of the city, or by virtue of the ordinance. The rights of the plaintiff exist only under the ordinance, but it is thought that the mayor derived authority in some way from the bond executed by the plaintiff. The terms of the ordinance as to the plaintiff's rights and those of the condition of the bond are not in entire harmony, and, although in the latter, power is apparently given to the mayor to terminate the contract before the first of March, yet there can be no doubt that on a non-compliance with that condition the only effect

of it would be the right, perhaps, to bring a suit upon the bond. It did not clothe the mayor with authority of his own motion to destroy the property of the plaintiff. Because a contract of lease is terminated by efflux of time the lessor has no right to dispossess the lessee by violence and destroy his property. If, by the terms of the ordinance authority had been expressly given to the city to remove the poles and wires of the plaintiff after the first of March, that might have operated by way of estoppel upon the telegraph company. But no such power is contained in the ordinance, nor is it fairly to be inferred from the condition of the bond, nor did the power exist by virtue of the official position of the mayor. The fact that there was an ordinance in force to prevent the construction of more telegraphic lines does not change the principle. The mayor can only execute the law when properly authorized. He cannot expound the contracts made by the city, claim they have been violated, and by his own act and will, and without the authority of a court of law or equity, enforce the penalty of their supposed violation. The wires had been placed on the telegraph poles by contract with or license from the city; they were, therefore, there in pursuance of law. It was not as if telegraph poles had been erected and wires attached, in violation of law, and therefore it was not like the case of the wooden house constructed within the limits of the city, which the supreme court of this state held could be removed of their own will by the city authorities. *King v. Davenport*, 98 Ill. 305.

It is admitted that nothing has been done by the defendants, nor, perhaps, even threatened, since the bill was filed. If there were, there can be no doubt that the court would have the power to put a stop to any such action.

But the next question to be considered is whether, if the plaintiff should proceed to replace the wires, or desire so to do, the court shall restrain the defendants from interference with such action by the plaintiff. That would be in the nature of affirmative relief by mere operation of the writ of injunction; and in this case the only effect of it would be to enable the plaintiff to do an act after the authority under which it is to be performed no longer exists. For, as has been already stated, the true construction of the ordinance seems to imply that whatever the result of the experiment for underground telegraphy may have been, the rights of the plaintiff, under the ordinance, terminated on the first day of March. What might be the effect of the termination of the contract upon the property of the plaintiff was an after matter, to be determined, in case of controversy, by some com-

petent tribunal. In this respect this is not like the cases cited by the plaintiff's counsel.

It is insisted by him that several cases have been decided which sustain the principle contended for, viz., that it is the duty of the court, in this case, to prevent the defendants from interfering with the plaintiff in replacing the wires which have been cut. The *Atlantic & Pac. Tel. Co.* v. *Union Pac. Ry. Co.* 1 McCrary, 541, [S. C. 1 FED. REP. 745,] cited in support of this doctrine, states in the head-note that, although a contract by a corporation may have been *ultra vires*, yet a court of equity will restrain a party from recovering possession of property which has passed under the contract, except by due process of law, and by the return of the consideration paid, and the case sustains that statement. The opinion of the court states the prayer of the bill, a part of which was that the defendant should be restrained from preventing the plaintiff from reconnecting the wires so as to restore them to their original condition before the same were severed, and it says a preliminary injunction was granted upon the bill, to what extent and in what particulars does not appear. The court, in the conclusion of the case, stated that the injunction granted would be so far modified as to make it clear that the railroad company, a party to the contract, was at liberty to institute legal proceedings to cancel and set aside the contract upon the return of the consideration, and to settle upon the principles of equity the accounts between the parties.

In *Western Union Tel. Co.* v. *St. Joseph & W. Ry. Co.* 1 McCrary, 565, [S. C. 3 FED. REP. 430,] the prayer of the bill was, among other things, for the same relief as in the case just cited, and the court concludes its opinion by saying that the defendants would be enjoined from attempting to eject the plaintiff or to seize the property.

In the case of *American Union Tel. Co.* v. *Union Pac. Ry.* 1 McCrary, 188; where the court admitted that one of the companies had the right to rescind the contract, it declared that it did not justify the taking possession, except by lawful means, and the court concluded its opinion by saying that the injunction granted would be so far modified as to make it clear that the railroad company was at liberty to institute legal proceedings, the same as in the case of *Atlantic & Pac. Tel. Co.* already referred to.

In the case of *Cole Silver Min. Co.* v. *Virginia & Gold Hill Water Co.* 1 Sawy. 470, where an unlawful act was done by the defendants in relation to water-power, the court held that the injunction would

issue, although it should be necessary for the defendants to fill up or build a water-tight barrier across the tunnel to accomplish the end sought; that is to say, what the defendants had done was in violation of the rights of the plaintiff, as the court thought, and it must cease violating the rights of the plaintiff, although it might require time, labor, and the expenditure of money to accomplish that purpose.

In the case of *Western Union Tel. Co.* v. *Kansas & Pac. Ry. Co.*,[*] decided by the district judge of Colorado, there is a statement by the court that the parties must be restored to the possession in which they were before the wrongful acts done by the defender, and for that purpose the court says: "The injunction will be allowed." It was, in fact, according to the view of the court, because the property was owned by the parties to the contract jointly, and the defendant had wrested the possession from its associate without warrant or authority of law.

I do not see in any of these cases, other than in that last cited, a distinct statement that the court would issue an injunction for the purpose of preventing the defendant from interfering with the plaintiff in the replacing of the wires cut, although the fact may have been that the injunction was issued. But, suppose that to be so, I do not think that any of these cases are like that before this court. The ground upon which the injunction issued in those cases, if it did issue, was because there were certain rights existing on the part of the plaintiff, independent of what grew out of the wrongful act, although the adjudication of those rights in one sense might be made because of the wrongful act done. Now, in this case there is nothing of the sort. What is the obligation of the city to the complainant in this case? The rights of the plaintiff have terminated by the efflux of time, as the court has already decided. There is no right and no obligation,—no right on the part of the plaintiff, and no obligation on the part of the defendants,—except what springs from the acts done by the mayor in the cutting of the wires, which, according to the view of the court, was technically a trespass for which he would be responsible. There has no consideration been paid by the plaintiff to the city, as in the cases cited. It was merely a license on the part of the city to the plaintiff temporarily to erect poles and string wires for telegraphic purposes.

Then, again, this is a case between an ordinary corporation on one side, and a municipal public corporation on the other. A great city, which, notwithstanding telegraph lines may be an instrument of com-

*4 Fed. Rep. 284.

merce, has the right, as I believe, to determine how, in what manner, and upon what condition a telegraph company shall enter the city and pass through it for the purpose of allowing the citizens of the country to communicate by telegraph, one with another. A railroad is a great instrument of commerce, and yet there can be no doubt that the city of Chicago has the right to prescribe the terms upon which a railroad shall come into and pass through the city, how cars shall be run, with what degree of speed, etc. These are all matters subject to the control of the city. Even were it true that this were a telegraph company clothed with all the rights given by the act of congress, the power of the city would, probably, still exist the same as with a railroad company or an ordinary telegraph company not acting under the authority of congress to regulate and control it.

While I have stated that the act of the mayor was unauthorized, I do not wish to be understood as declaring that if proper notice had been given to the telegraph company, after the first of March, to remove its wires, and to cease to act under the ordinance, and it did not comply with the terms of the ordinance or the conditions named in the bond, and the mayor had been authorized by the city council to act as he has done, that would have certainly been an unlawful act.

I can have no doubt that it is entirely competent for the city authorities, unless they are bound by some absolute contract permitting the poles and wires to stand as they are, to have them removed and put an end to such unsightly obstructions as these poles and wires are now in our streets. There must be a power, I think, somewhere, to cause them to be removed, and to regulate and control the manner in which telegraph lines shall enter or pass through the city.

I can see no object in the court issuing an injunction to prevent the city authorities from interfering with the plaintiff in replacing the wires, because, as I have said, it would enable them to do what I think they have no right to do under the ordinance. But, while I say this, I cannot lose sight of some portions of the evidence in this case. For example, by the ordinance itself, the city has a right to string fire-alarm wires upon the poles erected by the plaintiff, and to use them for that purpose, and so uses them notwithstanding the mayor has removed the wires of the plaintiff from the poles. Now why, so long as these poles stand and are used for this purpose, the plaintiff cannot be permitted also to string its wires upon these poles, is something I cannot comprehend. It seems to be an unfair dis-

crimination against the plaintiff in the operation of its telegraph lines. Other telegraph companies are using similar poles, and with wires strung upon them, and I do not see why, until the city adopts some decided policy in relation to poles and wires, which are now existing in our streets, the plaintiff cannot be permitted to use these poles as long as they stand for other purposes. If they stand for fire-alarms, why cannot they stand for the purpose of communicating by telegraph between different persons in and out of the city?

I would say in conclusion that I agree if there has anything been done which constitutes an irreparable wrong to the plaintiff, which can only be protected by a bill in equity, then the court might feel inclined to issue an injunction; but all that has been done, according to the view of the court, is an act of trespass; that has been done improperly, illegally, as I think, which could be done lawfully. The court has stated that it only decides as to the rights of the plaintiff under the ordinance, and the action connected therewith. It is alleged in the bill, as I have already said, that wires have been put up by the plaintiff upon the poles of the Chicago & Milwaukee Telegraph Company. If there were proper allegations in the bill in relation to the rights of the Chicago & Milwaukee Telegraph Company in the city, then I think the principles which I have stated would not apply, because I am not prepared to say but that if the Chicago & Milwaukee Company has the right to erect its poles and to place wires upon them, that it could not give that permission to the plaintiff; but there are no allegations in the bill upon the subject, except the fact is shown that the poles are erected. How, or why, or under what authority, does not appear.